Zoila ALVAREZ–GARCIA, Petitioner,

v.

John ASHCROFT, Attorney General,* Respondent.

No. 02–73951.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 2004.

Filed Aug. 10, 2004.

---

* We amend the caption to reflect that John Ashcroft, Attorney General, is the proper respondent pursuant to FED. R. APP. P. 43(c)(2).

The Clerk shall amend the docket to reflect the above caption.

Martin R. Guajardo, San Francisco, CA, for the petitioner.

Jennifer Paisner, Linda S. Wernery, Department of Justice, Washington, DC, for the respondent.

Before WALLACE, KOZINSKI, and THOMAS, Circuit Judges.

WALLACE, Senior Circuit Judge:

Zoila Alvarez–Garcia petitions for review of the Board of Immigration Appeals' (Board) decision to affirm, without opinion, an Immigration Judge's (IJ) exclusion and deportation order. We follow the transitional rules for judicial review under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub.L. No. 104–208, 110 Stat. 3009–546, since immigration proceedings were initi-

ated against Alvarez–Garcia before April 1, 1997, and her final order of exclusion was issued after October 31, 1996. *Melkonian v. Ashcroft*, 320 F.3d 1061, 1064 n. 1 (9th Cir.2003). We thus have jurisdiction pursuant to 8 U.S.C. § 1105a (1996), *as amended by* IIRIRA § 309(c), 110 Stat. at 3009–625 to 3009–627, and we deny Alvarez–Garcia's petition.

I.

Alvarez–Garcia initially entered the United States without inspection in 1974. Immigration and Naturalization Service (INS) officers arrested her in 1979, and she was subsequently granted a short period of time to depart voluntarily. After this time expired without her departure, a deportation warrant was issued in her name. Alvarez–Garcia's next encounter with immigration officials occurred on December 20, 1994, when federal agents detained her at the San Francisco International Airport for attempting to enter the United States with a false birth certificate bearing the name "Sylvia Soto." Alvarez–Garcia pled guilty on July 5, 1995, to the ensuing criminal charge for possession of a false identification document with intent to defraud, a misdemeanor.

In the meantime, the INS had charged Alvarez–Garcia as excludable on four grounds and commenced exclusion proceedings. The next day, Alvarez–Garcia wed Edward Soto, a United States citizen with whom she claimed to have lived since 1985. The prospect of exclusion from the United States apparently prompted the marriage; by legalizing her relationship with Soto, Alvarez–Garcia might have gained lawful permanent residence. Soto and Alvarez–Garcia took the next steps toward that end on March 21, 1995: Soto petitioned for a relative immigrant visa on Alvarez–Garcia's behalf, and Alvarez–Garcia, in accordance with the governing regu-

lations, simultaneously applied to the INS district director for adjustment of status. The district director approved Soto's petition on November 13, 1995, but stated that he had not yet made a decision on Alvarez–Garcia's pending application. To remove remaining legal obstacles to permanent residency, Alvarez–Garcia sought a waiver of one ground of excludability—her fraud offense—and requested permission to reapply for admission into the United States after removal.

Alvarez–Garcia did not contest the INS's charges at her initial exclusion hearing in 1996. Instead, she expressed her intention to proceed with her adjustment of status application and to file the above-mentioned documents. The IJ continued Alvarez–Garcia's case multiple times over the next four years, ostensibly to allow her time to secure this relief.

The district director denied Alvarez–Garcia permission to reapply for admission on March 30, 2000. A week later (and the same day the INS served the denial on Alvarez–Garcia's counsel), Alvarez–Garcia appeared in front of the IJ for the first time since her initial exclusion hearing. She again conceded excludability, but requested that the IJ review de novo her application for adjustment of status. The IJ declined on various grounds. Most importantly, the IJ concluded that she lacked jurisdiction to adjust the status of an alien, such as Alvarez Garcia, in exclusion proceedings. Alvarez–Garcia challenged this proposition on equal protection grounds, essentially pointing to the IJ's authority to consider the applications (and corresponding requests for waiver and permission to reapply) of those subject to deportation and arguing that there is no rational basis to draw a distinction between excludable and deportable aliens. The IJ refused to address Alvarez–Garcia's contention be-cause constitutional arguments fell outside her jurisdiction.

Alvarez–Garcia repeated her equal protection claim on appeal to the Board and, following the Board's affirmance without opinion, to us in her petition for review.

## II.

▮ Because the Board affirmed the IJ without opinion, we review the IJ's decision "as though it were the Board's." *Wang v. INS,* 352 F.3d 1250, 1253 (9th Cir.2003). We review de novo purely legal questions, *Jahed v. INS,* 356 F.3d 991, 997 (9th Cir.2004), as well as due process challenges, *Padilla v. Ashcroft,* 334 F.3d 921, 923 (9th Cir.2003).

▮ Alvarez–Garcia's equal protection argument centers on the treatment she received by virtue of being an excludable, rather than deportable, alien. Since she was in exclusion proceedings, INS regulations compelled Alvarez–Garcia to submit her adjustment of status application to "the[INS district] director having jurisdiction over … her place of residence." 8 C.F.R. § 245.2(a)(1) (2000) (now codified at 8 C.F.R. § 1245.2(a)(1)). "[T]he director … considering the application for adjustment of status" likewise was the proper recipient of Alvarez–Garcia's request to waive the grounds on which she was excludable, *id.* § 212.7(a)(1)(ii) (now codified at 8 C.F.R. § 1212.7(a)(1)(ii)), and her application for permission to reapply for admission to the United States, *see id.* § 212.2(e) (now codified at 8 C.F.R. § 1212.2(e)). Alvarez–Garcia would have faced a different procedure had she been subject to deportation: her application for adjustment of status would need to "be made and considered only in[deportation] proceedings," *id.* § 245.2(a)(1) (now codified at 8 C.F.R. § 1245.2(a)(1)), as would her waiver request, *see id.* § 212.7(a)(1)(ii) (now codified at 8 C.F.R.

§ 1212.7(a)(1)(ii)), and permission to reapply, *see id.* § 212.2(e) (now codified at 8 C.F.R. § 1212.2(e)). *See generally In re Castro–Padron*, 21 I. & N. Dec. 379, 379 (BIA 1996) (en banc) ("The regulations specifically limit the [IJ]'s authority ... over applications for [adjustment of status] relief to those which are filed by aliens in deportation proceedings....").

Alvarez–Garcia contends that barring the IJ from adjudicating her applications simply because she happened to be charged as "excludable" rather than "deportable" denies her equal protection under the Fifth Amendment's Due Process Clause. *See Catholic Soc. Servs., Inc. v. INS*, 232 F.3d 1139, 1152 n. 5 (9th Cir. 2000) (en banc) ("An equal protection claim under the Fifth Amendment is brought under the equal protection component of the Due Process Clause"). Excludable and deportable aliens, her argument goes, are otherwise similarly situated, especially since Congress allowed certain aliens who had not been "inspected and admitted or paroled" (as normally required to adjust status, 8 U.S.C. § 1255(a)) to pay an additional sum to be treated as if they had. *See* 8 U.S.C. § 1255(i).

■ In attacking this procedural difference on equal protection grounds, Alvarez–Garcia assumes too much. Under controlling precedent, excludable aliens have no constitutional right to the same procedures afforded deportable aliens in the admission process. A fundamental distinction "runs throughout immigration law": "[t]he distinction between an alien who has effected an entry into the United States and one who has never entered." *Zadvydas v. Davis*, 533 U.S. 678, 693, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001); *see also Barrera–Echavarria v. Rison*, 44 F.3d 1441, 1448 (9th Cir.1995) (en banc) ("The Supreme Court has consistently recognized that our immigration laws have long

made a distinction between those aliens who have come to our shores seeking admission and those who are within the United States after an entry, irrespective of its legality." (internal quotation marks, ellipsis, and citations omitted)), *superseded by statute on other grounds as stated in Xi v. United States INS*, 298 F.3d 832, 837 (9th Cir.2002). This distinction is significant. Aliens "standing on the threshold of entry" are "not entitled to the constitutional protections provided to those within the territorial jurisdiction of the United States." *Ma v. Ashcroft*, 257 F.3d 1095, 1107 (9th Cir.2001); *see also Zadvydas*, 533 U.S. at 693, 121 S.Ct. 2491 ("It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders."). For this reason, immigration laws can constitutionally "treat[ ] aliens who are already on our soil (and who are therefore deportable) more favorably than aliens who are merely seeking admittance (and who are therefore excludable)." *Servin–Espinoza v. Ashcroft*, 309 F.3d 1193, 1198 (9th Cir.2002).

■ As an excludable alien, Alvarez–Garcia, though she currently stands on United States soil, is classified as "one who has never entered" the country. The "entry fiction" explains the apparent paradox: the doctrine "provides that although aliens seeking admission into the United States may physically be allowed within its borders pending a determination of admissibility, such aliens are legally considered to be detained at the border and hence as never having effected entry into this country." *Barrera–Echavarria*, 44 F.3d at 1450 (internal quotation marks, brackets, and citations omitted); *see also Kaplan v. Tod*, 267 U.S. 228, 230, 45 S.Ct. 257, 69 L.Ed. 585 (1925) (declaring that an excluded alien "was still in theory of law at the boundary line and had gained no foothold

in the United States"). Alvarez–Garcia is thus "not entitled to the constitutional protections provided to those," such as deportable aliens, "within the territorial jurisdiction of the United States." *Ma,* 257 F.3d at 1107; *see also Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.").

The precise reach of the entry fiction doctrine is unclear. *See, e.g., Barrera–Echavarria,* 44 F.3d at 1449 ("Some of the cases involving excludable aliens suggest that they do enjoy certain substantive constitutional rights."). We grappled with this issue most recently in *Wong v. United States INS,* 373 F.3d 952 (9th Cir.2004). There, a non-admitted alien brought a damage action against INS officials alleging that they discriminated against her on racial, religious, and national origin grounds and thus violated, inter alia, her equal protection rights under the Fifth Amendment's Due Process Clause. *Id.* at 959. Confronted for the first time with the question whether the entry fiction deprives non-admitted aliens of all substantive constitutional rights, we found persuasive "cases ... indicat[ing] that the entry doctrine does not categorically exclude non-admitted aliens from all constitutional coverage, including coverage by equal protection guarantees." *Id.* at 973. We therefore held that the entry fiction did not necessarily preclude a non-admitted alien from "coming within the ambit of the equal protection component of the Due Process Clause," at least for purposes of stating a cognizable constitutional claim "sufficient at th[e] pleading stage." *Id.* at 974–75.

Although *Wong* concluded that the government cannot, consistent with the constitution, mistreat non-admitted aliens with impunity, we reaffirmed that "[t]he entry fiction ... appears determinative of the *procedural* rights of aliens with respect to their applications for admission." *Id.* at 971. The doctrine is thus determinative here: while framing her argument in equal protection terms, Alvarez–Garcia challenges the procedures afforded her in the admission process. In other words, the inequality of which she complains arises because aliens in deportation proceedings have a slightly different adjustment of status application process than she does in exclusion proceedings. Notably, the regulations at issue do not affect the availability of the underlying substantive relief: they do not entitle deportable aliens to adjust their status yet deprive excludable aliens of the same opportunity in some fashion. Nor do the regulations discriminate on an impermissible basis. Rather, the procedure varies along the well-established "distinction between an alien who has effected an entry into the United States and one who has never entered." *Zadvydas,* 533 U.S. at 693, 121 S.Ct. 2491. Indeed, to hold that Alvarez–Garcia has a substantive equal protection right to the same procedures enjoyed by deportable aliens would turn this distinction on its head. If Alvarez–Garcia could successfully invoke the Due Process Clause's equal protection component to defeat the current adjustment of status application process, any procedural dissimilarity between exclusion and deportation proceedings would be vulnerable as well. Since binding precedent plainly forecloses this result, we deny Alvarez–Garcia's equal protection claim.

■ In sum, we hold that under the entry fiction doctrine Alvarez–Garcia, as

an excludable alien, does not have an equal protection right to the same procedural mechanisms afforded deportable aliens in the admission process. Thus the regulations challenged here—which delegate decision making authority over the adjustment of status application of an excludable alien to a different administrator than would adjudicate it in deportation proceedings—comport with the Constitution.

Petition DENIED.