[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 20-14788

————————————————

VHV JEWELERS, LLC,

                                                            Plaintiff-Appellant,

*versus*

CHAD F. WOLF,
Acting Director of the U.S. Department of Homeland Security,
KATHY A. BARAN,
Director, California Service Center, U.S. Citizenship and Immigration Services,
KENNETH CUCCINELLI,
Acting Director, U.S. Citizenship and Immigration Services,

                                                            Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-04479-TWT

————————————

Before WILLIAM PRYOR, Chief Judge, LAGOA, Circuit Judge, and
WATKINS,\* District Judge.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether the United States
Citizenship and Immigration Services acted in an arbitrary and ca-
pricious manner when it denied VHV Jewelers's petition to extend
the L-1 nonimmigrant classification of one of its employees, Viral
Harish Vaidya. For an employee to qualify for L-1 status as an ex-
ecutive, the Immigration and Nationality Act requires that the em-
ployee bear a certain set of high-level responsibilities and that the
employee primarily engage in those specified duties. The Agency
found that neither Vaidya's employment abroad nor his domestic
position met these requirements. VHV Jewelers petitioned for re-
view on the ground that the Agency's decision was arbitrary and
capricious, and the district court granted summary judgment in

---

\* Honorable W. Keith Watkins, United States District Judge for the Middle
District of Alabama, sitting by designation.

favor of the government. Because the Agency's decision was not arbitrary and capricious, we affirm.

## I.    BACKGROUND

The Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, and its implementing regulations create several categories of immigrants and nonimmigrant aliens. One provision of the Act allows multinational companies to transfer managerial and executive employees from foreign offices to their counterparts in the United States. *Id.* § 1101(a)(15)(L). Nonimmigrant aliens in this category are called "intracompany transferees" and the visas granted to them are known as "L-1 visas" because of the provision creating the category. 8 C.F.R. § 214.2(*l*)(1)(i) (2019).

Petitions for L-1 nonimmigrant status are filed with the United States Citizenship and Immigration Services. *Id.* § 214.2(*l*)(3). Petitioners must prove to the Agency that the transferee's foreign and domestic positions fulfill all the applicable requirements. *See* 8 U.S.C. § 1361. This appeal involves a subset of petitions for organizations that have been operating in the United States for less than one year: new-office petitions. *See* 8 C.F.R. § 214.2(*l*)(1)(ii)(F) (2019).

New-office petitions require evidence that the transferee was employed abroad "for one continuous year in the three year period preceding the filing of the petition in an executive or managerial capacity," *id.* § 214.2(*l*)(3)(v)(B), and evidence that the "intended United States operation, within one year of the approval of

4                    Opinion of the Court                20-14788

the petition, will support an executive or managerial position," *id.* § 214.2(*l*)(3)(v)(C). New-office petitions can be approved for a period not exceeding one year. *Id.* § 214.2(*l*)(7)(i)(A)(3). A transferee's L-1 classification may be extended by filing a new petition with the Agency, accompanied by statements explaining the duties the transferee performed in the last year and will perform under the extended petition. *See id.* § 214.2(*l*)(14)(ii)(A)–(E). The parties agree that the Agency is not bound by its decisions regarding initial new-office petitions when deciding if there is sufficient evidence to satisfy all the statutory and regulatory requirements in successive extension petitions.

The Act and its implementing regulations contain detailed definitions outlining the requirements for employment positions to qualify as managerial or executive. The definitions for "managerial capacity" and "executive capacity" each contain four elements stated in the conjunctive. So, the petitioner must prove that an intracompany transferee meets all four elements of each definition to qualify as "managerial" and "executive." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 12, at 116 (2012) ("With [a] conjunctive list, all [items] are required . . . ."). Additionally, a petitioner must prove that the transferee "primarily" engages in those high-level responsibilities that qualify as managerial and executive, a modifier added to the regulatory definitions in 1988, *compare* 8 C.F.R. § 214.2(*l*)(1)(ii)(A)–(B) (1987), *with* 8 C.F.R. § 214.2(*l*)(1)(ii)(B)–(C)

(1988), and the statutory definitions in 1990, *see* Immigration Act of 1990, Pub. L. No. 101-649, § 123, 104 Stat. 4978, 4995–96.

The Act defines "managerial capacity" as the exercise of a level of control and discretion over the organization, either by supervising other employees or by managing a function of the organization:

> [A]n assignment within an organization in which the employee *primarily*—(i) manages the organization, or a department, subdivision, function, or component of the organization; (ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization; (iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; *and* (iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

8 U.S.C. § 1101(a)(44)(A) (emphases added); *accord* 8 C.F.R. § 214.2(*l*)(1)(ii)(B). The Act further provides that "[a] first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional." 8 U.S.C. § 1101(a)(44)(A).

6                     Opinion of the Court                20-14788

The Act defines "executive capacity" as the exercise of an even higher level of control and discretion, without much oversight from other members of the organization:

> [A]n assignment within an organization in which the employee *primarily*—(i) directs the management of the organization or a major component or function of the organization; (ii) establishes the goals and policies of the organization, component, or function; (iii) exercises wide latitude in discretionary decision-making; *and* (iv) receives only general supervision or direction from higher level executives, the board of directors, of stockholders of the organization.

*Id.* § 1101(a)(44)(B) (emphases added); *accord* 8 C.F.R. § 214.2(*l*)(1)(ii)(C) (2019). "[D]irects the management of" applies disjunctively to each of the three, succeeding series of nouns: "the organization"; "a major component . . . of the organization"; or "a major . . . function of the organization." *See* SCALIA & GARNER, READING LAW § 19, at 147 ("When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series.").

The Act provides an additional instruction to the Agency for evaluating the staffing levels of a petitioning organization: "If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the [Agency] shall take into account the reasonable needs of the organization . . . in

light of the overall purpose and stage of development of the organization . . . ." 8 U.S.C. § 1101(a)(44)(C). But "[a]n individual shall not be considered to be acting in a managerial or executive capacity . . . merely on the basis of the number of employees that the individual supervises or has supervised or directs or has directed." *Id.*

VHV Jewelers, LLC, a wholesale jewelry importer and the domestic counterpart of Khushi Jewels in India, has been headquartered in Atlanta, Georgia, since September 2016. VHV Jewelers filed a new-office petition in 2017, seeking L-1 nonimmigrant status for Viral Harish Vaidya, a citizen of India whom VHV Jewelers hoped to employ as its CEO. The Agency granted the new-office petition, which was in effect from October 20, 2017, until October 19, 2018.

The day before the first grant expired, VHV Jewelers filed a petition to extend Vaidya's L-1 classification for another two years. VHV Jewelers submitted several documents in support of its petition. Those documents included a letter of support authored by Vaidya, a letter of support from Khushi Jewels, and organizational charts, payroll information, invoices, emails, and other documents for both the foreign and domestic organizations.

Before making its final decision, the Agency requested additional information from VHV Jewelers. It explained why the evidence submitted with the extension petition was insufficient, asked for more information on the nature of Vaidya's foreign and domestic duties and the organization's staffing, and gave examples of the kinds of evidence that might satisfy the Agency. VHV Jewelers sent

the Agency additional evidence in response to the request, including a new letter of support authored by Vaidya, a new letter from Khushi Jewels, a new organizational chart for VHV Jewelers, additional payroll information, and various business documents related to the domestic operation. VHV Jewelers also clarified that it was asking Vaidya to be classified as an executive, not a manager.

After reviewing all the evidence provided by VHV Jewelers, the Agency denied the petition on two independent grounds. First, the Agency concluded that the record was insufficient to prove that Vaidya was employed in an executive capacity in his foreign position. Second, the Agency found that the record was likewise insufficient regarding his domestic position.

The Agency provided several reasons why the evidence was insufficient for both positions. The Agency interpreted the requirement that an executive "direct the management" as requiring that an executive exercise control over a subordinate level of managerial staff, and concluded that, based on the record evidence, Vaidya could not satisfy this requirement for either his foreign or domestic positions because Vaidya's subordinates did not hold positions in a managerial capacity. The Agency also found that, for both positions, Vaidya's own duties did "not make sense given the overall nature and organizational complexity of the foreign organization," that Vaidya appeared to perform many non-qualifying duties such that he did not "primarily" perform executive duties, and that the descriptions of his duties were "overly broad and generic and did

not provide sufficient insight into the actual nature of [Vaidya's] role within the organization." Regarding the foreign position in particular, the Agency found that there were many inconsistencies between the description of Vaidya's responsibilities provided with the extension petition and the description provided after the Agency requested more evidence.

VHV Jewelers filed a complaint in the district court that the Agency's denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). The parties later filed cross-motions for summary judgment. The district court denied VHV Jewelers's motion and granted the government's motion. The district court ruled that the Agency's decision regarding Vaidya's foreign position was not arbitrary and capricious. VHV Jewelers needed to establish that the Agency's decision was arbitrary and capricious as to both of the independent reasons to succeed on appeal, the district court did not consider the Agency's decision regarding the domestic position. *Cf. BDPCS, Inc. v. Fed. Commc'n Comm'n*, 351 F.3d 1177, 1183 (D.C. Cir. 2003) (explaining that the party challenging an agency's actions must prevail on "each of the two independent . . . grounds" upon which the agency made its decision).

## II.    STANDARD OF REVIEW

This Court reviews a summary judgment *de novo*, "view[ing] all facts and reasonable inferences in the light most favorable to the nonmoving party." *Shuford v. Fid. Nat'l Prop. &*

*Cas. Ins. Co.*, 508 F.3d 1337, 1341 (11th Cir. 2007). And the Administrative Procedure Act directs us to "set aside [an] agency action" only when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "This standard is exceedingly deferential" and limits our role to "ensur[ing] that the agency came to a rational conclusion." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (alteration adopted) (internal quotation marks omitted).

## III.    DISCUSSION

We divide our discussion in two parts. First, we explain that the Agency correctly interpreted the statutory definition of "executive capacity." Second, we explain why the Agency's decision was not arbitrary and capricious.

### A.  *The Agency Correctly Interpreted the Statutory Definition of "Executive Capacity."*

VHV Jewelers disagrees with the Agency's interpretation of "direct the management" in the executive capacity definition. VHV Jewelers argues that to "direct the management" does not require that there be a subordinate level of managerial employees and that the Agency's demand for evidence that Vaidya directed managerial employees was arbitrary and capricious. It points to the definition of "managerial capacity," which requires that a manager "supervise[] and control[] the work of other supervisory, professional, or managerial employees, or manage[] an essential function within the organization, or a department or subdivision of the

organization." 8 U.S.C. § 1101(a)(44)(A)(ii). And it argues that if Congress meant to require that executives "control managerial staff," then that requirement would be "stated in the statute" in a similar manner. We disagree.

VHV Jewelers would have us erase the distinction in the Act between an executive, who "directs the management of the organization," *id.* § 1101(a)(44)(B)(i), and a manager, who "manages the organization," *id.* § 1101(a)(44)(A)(i). When the relevant language was added to the Act in 1990, to "direct" meant "[t]o point to; guide; order; command; instruct" and "[t]o advise, suggest, request." *Direct*, BLACK'S LAW DICTIONARY (6th ed. 1990). So the requirement that an executive "direct the management" means that an executive must guide, order, command, or instruct the management. In other words, an executive manages the management. VHV Jewelers offers no alternative explanation of the difference between "direct[ing] the management" and "manag[ing]."

The word "direct" in the adjacent staffing-levels provision of the Act confirms our interpretation. *See* SCALIA & GARNER, READING LAW § 25, at 170 (explaining that a "word or phrase is presumed to bear the same meaning throughout a text"). The staffing-levels provision provides that "[a]n individual shall not be considered to be acting in a managerial or executive capacity . . . merely on the basis of the number of employees that the individual supervises or has supervised or *directs* or *has directed*." 8 U.S.C. § 1101(a)(44)(C) (emphases added). There, the term "directs"

functions as a description of the control an executive exercises over other employees, and its placement in the text as the parallel term to "supervise" further confirms that "directs" refers to executive control of subordinate employees, just as "supervises" refers to managerial control of subordinate employees.

At least one other provision of the Act also supports our interpretation. Although the Act requires that an executive "receive[] only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization," *id.* § 1101(a)(44)(B)(iv), the definition for managerial capacity has no such independence requirement. The absence of such a requirement in the definition for managers allows managers to be directed by executives. *See* SCALIA & GARNER, READING LAW § 24, at 167 (explaining that the "judicial interpreter" is "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts").

This interpretation of "direct the management" does not foreclose the possibility that employees of small organizations would be eligible for L-1 visa classification. "[A]n organization's small size, standing alone, cannot support a finding that its employee is not acting in a managerial capacity . . . ." *Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1070 (9th Cir. 2008). But "size is nevertheless a relevant factor in assessing whether an organization's operations are substantial enough to support a manager" or an executive, and the burden remains on the petitioning

organization to prove that the transferee's duties are primarily managerial or executive. *Id.* at 1070–71 (alterations adopted) (internal quotation marks omitted). That such a showing might be more challenging for a smaller organization does not change the meaning of the Act's requirements.

### B. *The Agency's Decision Was Not Arbitrary and Capricious.*

VHV Jewelers does not identify any record evidence that the Agency failed to consider or misconstrued in an arbitrary and capricious manner. For example, VHV Jewelers asserts that the Agency "blatantly ignor[ed]" certain evidence of Vaidya's duties, but it points to no record evidence that was not considered by the Agency in its decision. In fact, the Agency decision explicitly addressed both of the job descriptions and both of the organizational charts provided by VHV Jewelers—which are the only pieces of evidence cited in VHV Jewelers's briefs. VHV Jewelers also contends that Vaidya's foreign and domestic job duties "correspond with each element" of the "executive capacity" definition, but it points to no evidence that counters the Agency's determination that many of Vaidya's duties were "non-qualifying duties" related to sales, training, marketing, pricing, and supervising "non-qualifying personnel." VHV Jewelers's arguments about the weight the Agency should have afforded certain pieces of evidence are similarly inapposite, as it is not the role of this Court to "substitute its . . . judgment" for that of the administrative agency. *Sierra Club*, 526 F.3d at 1360(internal quotation marks omitted); *see also*

*Republic of Transkei v. Immigr. & Naturalization Serv.* 923 F.2d 175, 177 (D.C. Cir. 1991) (holding that the Agency's decision was not arbitrary and capricious when it found that "the statute and regulations required more precise evidence" about the transferee's role in the organization than was provided by the petitioning organization).

VHV Jewelers also argues that the Agency was incorrect to find that there were "inconsistencies" between the foreign job descriptions listed in the original petition and those in the response to the request for evidence, but the several inconsistencies between the two lists are immediately apparent. For example, the first list states that Vaidya spent twenty percent of his time in his foreign position on "Financial, Tax, Risk and Facilities Management," but no duty related to any of those topics appears on the second list. Similarly, the first description listed "Staff hiring and training" as occupying ten percent of Vaidya's time, but nothing related to staff hiring or training is assigned any percentage of Vaidya's time in the second description. The Agency's reliance on these inconsistencies in its decision-making was not arbitrary and capricious.

## IV.    CONCLUSION

We **AFFIRM** the judgment in favor of the government.